**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ANNETTE C. BAIOCCO,**

         **Plaintiff,**               **Case No. 2:15-cv-2052**

    **v.**                        **Judge James L. Graham**

**COMMISSIONER OF SOCIAL**        **Magistrate Judge Elizabeth P. Deavers**
**SECURITY,**

         **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Annette C. Baiocco, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 14), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her application for benefits on August 30, 2011, alleging that she has been disabled since October 1, 2005 due to depression, anxiety, and chronic neck pain. (R. at 170-173, 264.) Plaintiff's application was denied initially and upon reconsideration. (R. at 84, 92.) Plaintiff sought a de novo hearing before an administrative law judge. Administrative Law Judge George A. Mills, III (the "ALJ") held a hearing on November 13, 2013, at which Plaintiff, represented by counsel, appeared and testified. (R. at 34-76.) Anthony Michael, a vocational

expert, also appeared and testified at the hearing.  On December 2, 2013, the ALJ issued a

decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(R. at 14-26.)  On March 25, 2015, the Appeals Council denied Plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then

timely commenced the instant action.

## II. PLAINTIFF'S HEARING TESTIMONY

Plaintiff testified at the administrative hearing that she was married during the insured

period.[1] (R. at 46.) According to Plaintiff, she has held a valid driver's license since the age of

sixteen, but did not drive during the period in question. (R. at 47.)

Plaintiff testified that she was employed by her village government from 2001 to 2004.

(R. at 50.)   She stated that the job required her to sit and use a computer.  (R. at 51.)  She

reported that she had no problems doing either at that time.  (*Id.*)  Plaintiff also testified that she

answered the phone and interacted with customers coming in to pay bills and request service.

(*Id.*)

Plaintiff testified that she worked as a tax preparer for H&R Block from 1999 until 2005.

(R. at 52.)  According to Plaintiff, she also taught classes and worked as a receptionist.  (*Id.*)

Plaintiff stated that she "never turned down any work, but I wasn't having panic attacks at the

time, I was able to drive."  (*Id.*)  Plaintiff testified, "that was the job I loved."  (*Id.*)

Plaintiff testified that she had no problems reading, writing, and doing simple arithmetic.

(R. at 48.)  Plaintiff stated, however, that she had not read a book since 2005.  (R. at 59.)

According to Plaintiff, she quit her job at H&R Block because her anxiety attacks prevented her

from driving the six miles to and from work.  (R. at 48.)  Plaintiff stated that in 2005 she "started

---

[1] Plaintiff's alleged onset date is October 1, 2005 and her last insured date is September 30,
2008.  (R. at 14.)

2

getting severe panic attacks [while driving] where I would have to pull over."  (R. at 49.)  When asked by the ALJ "[w]hat it is that disables you . . . what were your worst medical conditions," Plaintiff responded that it was the fact that she could not drive due to her panic attacks.  (R. at 54.)  When asked again by her attorney what was her "worst medical problem," she replied, "My anxiety and the depression that went with it."  (R. at 55.)

Plaintiff also testified that during the relevant period she avoided interaction with people, other than the most necessary, such as doctors, due to her anxiety.  (R. at 56.)  Plaintiff estimated that between 2005 and 2008 she had, on average, more than one panic attack daily.  (R. at 58.)  When asked to describe one of her panic attacks, she stated, "It starts like in the pit of my stomach, and overwhelming dread comes over me and I freeze sometimes.  . . . A like living hell.  I mean my heart races, I get nervous, my mind is racking, I will sweat, I can't concentrate."  (*Id*.)

Plaintiff further testified that she received treatment during the relevant period for constant neck pain that travels down to her hand and causes her pinkie and ring finger to go numb.  (R. at 60.)  According to Plaintiff, the pain caused her difficulty when writing, making her cursive illegible.  (*Id*.)  Plaintiff also stated that she suffered, on average, two migraines per week that caused her to avoid all light and talking and usually caused her to vomit.  (R. at 61.)  Plaintiff testified that these migraines would often last for hours.  (R. at 62.)

Plaintiff testified that on "a good day" she would be able to get out of bed, put on sweatpants and do housework, such as vacuuming.  (R. at 63.)  On "bad days," however, Plaintiff testified that she would stay in her pajamas all day and get nothing accomplished.  (*Id*.)  According to Plaintiff, during the relevant period, she experienced more "bad days" than "good days."  (*Id*.)

### III. MEDICAL RECORDS

**A. DOUGLAS TRUBIANO, D.O.**

On January 18, 2005, Plaintiff saw Dr. Trubiano and reported "some numbness in her left pinky at times." (R. at 274.) Dr. Trubiano found that Plaintiff exhibited "moderate anxious affect" and "positive pain flexion, extension, rotation of cervical spine." (*Id*.) Dr. Trubiano reviewed with Plaintiff the December 18, 2004 MRI that showed "a mild disc bulge with a small disc protrusion at C6, plus a mild degree of spinal stenosis." (*Id*.)

On February 3, 2005 Plaintiff saw Dr. Trubiano complaining of occasional numbness in her left pinky and cervical pain. (R. at 273.) Dr. Trubiano found "mild to moderate anxious affect" and "positive pain flexion, extension, rotation of cervical vertebrae." (*Id*.) Dr. Trubiano recommended electromyography to evaluate her pinky numbness, but Plaintiff refused the test. (*Id*.) Dr. Trubiano prescribed continued Xanax for Plaintiff's anxiety, Soma for her neck pain, and a follow-up visit in two months. (*Id*.)

On March 22, 2005 Plaintiff saw Dr. Trubiano again and reported "she has cervical pain at times in her neck." (R. at 272.) Dr. Trubiano found that Plaintiff exhibited a "mild anxious affect" and "positive pain flexion, extension, rotation of cervical spine." (*Id*.) He prescribed continued Xanax and Soma. (*Id*.)

On April 5, 2005 Dr. Trubiano observed that Plaintiff exhibited a "mild anxious affect" and "positive pain flexion, extension, rotation of cervical spine." (R. at 267.) He prescribed continued Xanax and Soma. (*Id*.)

On May 2, 2005, Dr. Trubiano saw Plaintiff for anxiety and cervical pain. (R. at 266.) He prescribed continued Xanax for Plaintiff's anxiety and continued Soma and Fioricet for her neck pain. (*Id*.)

On August 1, 2005, Plaintiff visited Dr. Trubiano complaining of headaches, anxiety and neck pain. (R. at 265.) Dr. Trubiano observed that Plaintiff exhibited a "mild anxious affect" and "mild pain on flexion, extension, rotation of cervical spine." (*Id*.) He prescribed continued Fioricet and Xanax. (*Id*.)

On November 7, 2005, Dr. Trubiano saw Plaintiff for neck pain, headaches, depression, and anxiety. (R. at 264.) He noted that Plaintiff exhibited a "depressed/anxious affect" and "cervical spine pain/spasm." (*Id*.) He prescribed continued pharmaceutical treatment. (*Id*.)

On January 25, 2006, Dr. Trubiano saw Plaintiff for a possible hernia recurrence. (R. at 263.) He observed that Plaintiff exhibited a "mild anxious affect" and "pain on flexion, extension, rotation of the cervical spine." (*Id*.) Dr. Trubiano prescribed continued treatment with Xanax, Soma, and Fioricet. (*Id*.)

On April 17, 2006, Plaintiff visited Dr. Trubiano complaining of neck pain and headaches. (R. at 262.) He did not remark on Plaintiff's affect, but noted that she exhibited "pain flexion/ extension neck." (*Id*.) He prescribed continued pharmaceutical treatment and a follow-up in three months. (*Id*.)

On July 27, 2006, Dr. Trubiano saw Plaintiff for headaches and neck pain. (R. at 261.) He observed that Plaintiff displayed an "anxious affect" and "pain flexion/extension neck." (*Id*.) Dr. Trubiano continued Plaintiff's pharmaceutical treatment regime. (*Id*.)

On October 26, 2006, Dr. Trubiano saw Plaintiff for headaches, anxiety, and neck pain. (R. at 260.) He noted that Plaintiff exhibited an "anxious affect." (*Id*.) Dr. Trubiano prescribed continued pharmaceutical treatment. (*Id*.)

On January 1, 2015, Plaintiff visited Dr. Trubiano complaining of "constant headache" with vomiting and anxiety.  (R. at 259.)  Dr. Trubiano observed that Plaintiff displayed an "anxious affect" and "neck pain."  (*Id*.)  He continued Plaintiff's pharmaceutical treatment.  (*Id*.)

On April 19, 2007, Dr. Trubiano saw Plaintiff who complained of "severe neck pain and headaches," shoulder pain, and anxiety.  (R. at 258.)  Plaintiff reported that due to her shoulder pain she could not lie on her side.  (*Id*.)  Dr. Trubiano noted that Plaintiff exhibited an "anxious affect" and "cervical pain on flexion/extension."  (*Id*.)  He continued Plaintiff's pharmaceutical treatment.  (*Id*.)

On May 1, 2007 Dr. Trubiano examined Plaintiff and noted cervical pain and left arm radiculopathy.  (R. at 271.)

At Dr. Trubiano's request, Plaintiff underwent a contrast MRI of her cervical spine on June 3, 2007.  The findings were as follows:

At C2-3, C3-4 and C4-5 levels, no significant abnormalities are seen.

At C5-6 level, degenerative disc disease is present.  There is desiccation of the intervertebral disc.  There is concentric disc bulge with overlying endplate osteophyte formation.  This disc and osteophyte complex effaces the ventral CSF space resulting in mild narrowing of the spinal canal.  This also results in some left neural foramina narrowing with [illegible] facet and uncovertebral joint degenerative joint disease.

At C6-7 level, there is concentric disc bulge with no spinal stenosis or neural foraminal narrowing.  The bulge is accompanied by overlying endplate osteophyte formation which results in incomplete effacement of the ventral CSF space.

At C7-T1 level, no abnormalities are seen.

(R. at 285.)

On June 11, 1007 Plaintiff saw Dr. Trubiano, who noted cervical neck pain, anxiety, and left arm radiculopathy.  (R. at 269.)

On August 9, 2007 Dr. Trubiano examined Plaintiff, who complained of panic attacks. (R. at 256.)  Plaintiff complained that her Paxil prescription was making her "too tired."  (*Id*.) Dr. Trubiano noted that Plaintiff exhibited an "anxious affect" and "pain flexion/extension cervical spine."  (R. at 257.)  He adjusted Plaintiff's prescriptions, but continued her on a pharmaceutical treatment plan.  (*Id*.)

On September 13, 2007, Plaintiff visited Dr. Trubiano complaining of "severe headache" lasting several days.  (R. at 254.)  Dr. Trubiano noted that Plaintiff displayed "depression/ anxious affect" and "pain flexion/extension cervical spine."  (R. at 255.)  He continued Plaintiff on her pharmaceutical treatment plan.  (*Id*.)

On October 12, 2007 Dr. Trubiano saw Plaintiff and diagnosed hypertension, anxiety, and depression. (R. at 253.)  He prescribed an increase dose of Loptal and restarting Xanax.  (*Id*.)

On April 10, 2008, Plaintiff underwent a second MRI of her cervical spine at the request of Dr. Trubiano.  The findings were as follows:

> No intrinsic abnormalities of the cervical cord or cerebellar tonsillar position are noted.  No acute bony abnormality or edema is seen on the STIR sequence.  There is disc narrowing at C5-6 with endplate degenerative change and irregularity.
>
> Axial sequences demonstrate posterior spurring as well as what appears to be a broad-based soft disc component at C5-6, contiguous to the anterior cord.  There is a tight spinal canal at this level.  At C6-7 there is also a very tight spinal canal, with posterior spurring right centrally demonstrated.  At C6-7 both foramina are narrowed, particularly the right.  At C5-6 both foramina are narrowed.
>
> C7-T1 is unremarkable.  C2-3 and C3-4 are unremarkable.  C4-5 is unremarkable.
>
> Compared to prior exam of 06/03/07 there has been considerable increased narrowings of the foramina at C5-6 and C6-7.  The C6-7 spurring is new or increased and the C5-6 spurring has also increased.

(R. at 316.)

On September 28, 2011, Dr. Trubiano completed a functional assessment.  Regarding Plaintiff's limitations, he opined as follows:

> Patient cannot sit more than 2 hours due to cervical spine.  She cannot function in any work stress environment to the severe panic attacks.  The anxiety/panic attacks affect her ability to concentrate and follow instructions.  . . . She is completely disabled and will never work again.

(R. at 345.)

On February 17, 2012, Dr. Trubiano completed another functional assessment.  (R. at 358.)  He stated that Plaintiff's anxiety and panic attacks "prevent her from most driving situations affecting employment."  (*Id*.)  Dr. Trubiano also stated that Plaintiff's anxiety, panic attacks, and neck pain were not controlled by her pharmaceutical treatment regimen.  (R. at 359.)  Regarding Plaintiff's limitations, he opined as follows:

> Patient unable to sit more than 2 hours at a time due to constant neck pain.  The panic attacks and anxiety prevent employment in any work environment with stress.  The anxiety prevents her ability to concentrate and follow directions.  . . . She is completely disabled and will never work again.

(*Id*.)

On December 5, 2012, Dr. Trubiano completed a Physical Capacity Evaluation.  (R. at 377.)  He opined that, in an eight-hour work day, Plaintiff can stand for thirty minutes at a time, for one hour total; walk for thirty minutes at time, for one hour total; and, sit thirty minutes at a time, for four hours total.  (*Id*.)  He further opined that Plaintiff could, on rare occasions, lift up to five pounds with either arm, or up to ten pounds with both.  (*Id*.)  Dr. Trubiano also stated his belief that Plaintiff would have more than five unscheduled absences per month due to her conditions.  (R. at 378.)  He also stated the following work related limitations:

> Patient has severe anxiety with panic attacks which prevent any stressful work environment and would cause multiple absences more than 5 days per month.  Cervical Neck pain and right arm shoulder pain limit the right arm lifting to 5 pounds.

8

(*Id.*)  Dr. Trubiano assessed Plaintiff's ability to accept instruction from superiors as extremely impaired.  (R. at 379.)  He also found Plaintiff's ability to work in coordination or proximity to others, to respond appropriately to co-workers, and to relate to the general public and maintain socially appropriate behavior as markedly impaired.  (*Id.*)  According to Dr. Trubiano, his answers would not change if Plaintiff's job required only minimal contact with others.  (*Id.*)  Dr. Trubiano further found Plaintiff's ability to perform and complete tasks at a consistent pace and to perform at levels expected by most employers to be extremely impaired.  (R. at 380.)  He also found Plaintiff's ability to work with other without being distracted, to process information accurately and use judgment, to carry out instructions and complete tasks independently, and to maintain attention and concentration for more than brief periods of time to be markedly impaired.  (*Id.*)  Dr. Trubiano found Plaintiff's ability to respond appropriately to changes, to remember locations, procedures, and instructions, to be aware of normal hazards and take precautions, to behave predictably, reliably, and stably, and to maintain personal appearance and hygiene as markedly impaired.  (*Id.*)  He found Plaintiff's ability to tolerate customary work pressures to be extremely impaired.  (R. at 381.)  Finally, Dr. Trubiano opined that Plaintiff's condition is expected to last twelve months or more and would likely deteriorate if she were placed under the stress of a normal 8 hour work day, five days per week.  (*Id.*)

On May 19, 2012, Dr. Trubiano saw Plaintiff and recorded her affect as "anxious," her judgment as "normal," her orientation as "alert and oriented" with respect to person, place, and time, and her mental status as "grossly normal."  (R. at 402.)  He recorded "tenderness" in Plaintiff's neck and normal flexion and extension in her back.  (R. at 401.)

On August 8, 2012,  Dr. Trubiano saw Plaintiff and recorded her affect as "normal," her judgment as "normal," her orientation as "alert and oriented" with respect to person, place, and

time, and her mental status as "grossly normal."  (R. at 396.)  He recorded "tenderness" in Plaintiff's neck and normal flexion and extension in her back.  (*Id*.)

On June 17, 2013, Dr. Trubiano saw Plaintiff and recorded her affect as "anxious," her judgment as "normal," her orientation as "alert and oriented" with respect to person, place, and time, and her mental status as "grossly normal."  (R. at 389.)  He recorded "tenderness" in Plaintiff's neck and normal flexion and extension in her back.  (*Id*.)

## B.  RONNI RITTENHOUSE, PH.D.

Plaintiff was examined by Ronni Rittenhouse Ph.D. on February 12, 2007 .  During her interview, Plaintiff reported she had experienced panic attacks and could not "cope with driving."  (R. at 246.)  Plaintiff stated that she first began having panic attacks in 2003 or 2004.  (*Id*.)  Plaintiff said that she "can drive in Tiltonsville, up to Rayland and Yorkville, [although] [t]here have been times when she was panicky and could hardly drive."  (*Id*.)  According to Plaintiff, she had not been treated for her panic attacks at that time, except for medication prescribed by Dr. Trubiano.  (*Id*.)  Plaintiff stated that she stopped taking Paxil after three months and had a prescription for Xanax.  (*Id*.)  Plaintiff reported that she re-injured a previous hernia while caring for her father-in-law.  (*Id*.)  Ms. Rittenhouse diagnosed Plaintiff with Panic without agoraphobia and codependence and found as follows:

> Her speech was clear and of a goal directed nature.  She was well oriented in all spheres.  She was neither deluded nor hallucinated.  She appears to be of average intelligence.  She was cleanly and appropriately groomed.  In general her judgment is good.  Her insight is limited.  She denies suicidal intention or ideation.  Her mood was neutral and her affect was somewhat agitated.  She was wringing her hands.  Annette is fidgety.

(R. at 247.)

Ms. Rittenhouse saw Plaintiff again on March 5, 2007 and found that Plaintiff "is taking care of herself a bit more but is still very anxious."  (R. at 249.)  On April 2, 2007 Ms.

10

Rittenhouse noted that Plaintiff continued to caretake for others.  (*Id*.)  On April 9, 2007, Ms. Rittenhouse recorded that Plaintiff was driving by not "very far."  (R. at 250.)  She recommended to Plaintiff that she "go away for rehab, where she can't focus on anyone but herself."  (*Id*.)  On June 5, 2007 she noted that Plaintiff "does appear to have made some strides in saying no."  (*Id*.)

### 3. BARBARA L. RUSH, PH.D.

On August 15, 2007, Plaintiff saw Barbara L. Rush, Ph.D. for a diagnostic interview.  (R. at 308.)  Plaintiff stated that she suffered from panic attacks that she thought began in the spring of 2003 when she was working at H&R Block.  (*Id*.)  Plaintiff also reported migraines and chronic sleep problems.  (R. at 309.)  Plaintiff also stated that she had restricted her daily activities, such as driving, due to fear of having a panic attack.  (*Id*.)  Plaintiff further stated that she had had some improvement lately and was able to travel with a friend and as a passenger in a car "much easier."  (*Id*.)

Ms. Rush described Plaintiff as "very talkative and candid" with an "animated and bright" aspect.  (*Id*.)  According to Ms. Rush, Plaintiff "cited no significant symptoms of depression" and appeared to have "good" insight and judgment.  (R. at 309-310.)  In an August 15, 2007 letter to Dr. Trubiano, Ms. Rush wrote that Plaintiff "report[ed] symptoms of a panic disorder" including agoraphobia.  (R. at 299.)

On September 6, 2007, Plaintiff told Ms. Rush that she had enjoyed a couple of weeks of vacation with her husband.  (R. at 307.)  Plaintiff also reported reading a few chapters of a book. (*Id*.)  On September 12, 2007, Plaintiff reported that she had been reading a book about dealing with fear and anxiety.  (R. at 306.)

On October 10, 2007, Plaintiff reported to Ms. Rush that she "believes she is not as tense as she has been," although she "is still struggling with fear of having a panic attack if she goes on the highway." (R. at 304.) Plaintiff also reported "some reading." (*Id*.) Ms. Rush indicated that Plaintiff had not experience any panic attacks since entering treatment with her, "but still has some chronic anxiety." (*Id*.) Plaintiff reported looking forward to the holidays and that she had been giving some care to her in-laws. (*Id*.)

In an October 24, 2007 progress note, Ms. Rush recorded Plaintiff's statement that she was able to read a book. (R. at 303.) Plaintiff also stated that she was using stress management tapes daily and using other non-pharmaceutical strategies to deal with her stress. (*Id*.)

## IV. ADMINISTRATIVE DECISION

On December 2, 2013, the ALJ issued his decision. (R. at 14-26.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act from her alleged onset date of October 1, 2005 through September 30, 2008. (R. at 14.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

since her alleged onset date through her last insured date.  (R. at 16.)  The ALJ found that

Plaintiff had the severe impairments of "papillary carcinoma of the thyroid/microcarcinoma of

the thyroid, status post thyroidectomy; multi-level degenerative disc disease of the cervical spine

associated with cervicalgia and shoulder pain; anxiety with/without agoraphobia and panic

disorder associated with depression; and headaches/migraine headache."  (*Id.*)  He further found

that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1,

specifically comparing her impairments against Listings 1.00 Musculoskeletal System, 9.00

Endocrine Disorders, 12.00 Mental Disorders, and 13.00 Malignant Neoplastic Diseases.  (R. at

17.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that,
> through the date last insured, the claimant had the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a) that involves lifting
> and carrying only 10 pounds occasionally and five pounds or less frequently,
> standing/walking as only necessary for up to two hours in an eight hour day,
> sitting up to eight hours with normal breaks and the following non-exertional
> limitations: no climbing of ladders, ropes or scaffolds; no more than occasional
> use of ramps or stairs; no more than occasional balancing, stooping, kneeling,
> crouching, and crawling; avoidance of concentrated exposure to temperature
> extremes, vibrations, and hazards such as moving plant machinery and
> unprotected heights; avoidance of concentrated exposure to fumes, dusts, odors,
> and poor ventilation; and limited to unskilled, simple, routine, and repetitive work
> in a low stress work setting involving no rapid production with no rapid
> production quotas.

(R. at 18.)  The ALJ found Plaintiff's "statements concerning the intensity, persistence and

limiting effects of [her] symptoms are not entirely credible."  (R. at 19.)  The ALJ found that

"Dr. Trubiano's medical records do not reveal significant objective findings to support a

disabling condition" and noted his "conservative pharmaceutical management" of Plaintiff's

---

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

various impairments.  (R. at 20.)  The ALJ gave "little" weight to Dr. Trubiano's December 2012

functional assessment and his February 2012 and September 2011 assessments because "they are

inconsistent with the . . . objective evidence that pertains to the period at issue," specifically Dr.

Trubiano's own treatment notes and the mental health findings of Dr. Rittenshouse and Dr. Rush.

(R. at 24.)  The ALJ noted that Dr. Trubiano's assessments were "based in part on the claimant's

subjective complaints and do not pertain entirely to the period at issue."  (*Id*.)  The ALJ gave

"little" weight to the opinions of the non-examining state agency doctors and psychologists.  (R.

at 23.)  Relying on the VE's testimony, the ALJ concluded that Plaintiff cannot perform her past

relevant work.  (R. at 25.)  The ALJ, again relying on the VE's testimony, determined that jobs

existed in significant numbers in the national economy that Plaintiff could have performed,

including inspector, sorter, and assembler.  (R. at 25-26.)  He therefore concluded that Plaintiff

was not disabled under the Social Security Act.  (R. at 26.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ's RFC is not supported by substantial evidence because the ALJ improperly declined to give controlling weight to Dr. Trubiano's opinions concerning Plaintiff's mental health and chronic neck pain. (ECF No. 8 at 8, 11.) Specifically, Plaintiff argues that Dr. Trubiano's opinions are the only relevant opinions of record and, therefore, must be given controlling weight. (*Id.* at 11, 13.) Plaintiff also asserts that the ALJ failed to provide good reasons for rejecting Dr. Trubiano's treating source opinion pursuant to 20 C.F.R. § 404.1527(c)(2). (*Id.* at 13.)

Plaintiff maintains that the ALJ erred in declining to accord controlling weight to Dr. Trubiano's opinion where his opinions are "unchallenged." (*Id.* at 11, 13.) Plaintiff also maintains reversal is warranted because the ALJ failed provide more than "a boilerplate

dismissal of Dr. Trubiano's opinions without any indication of what evidence was contrary to those opinions." (*Id.* at 15.)  The Undersigned finds no error with the ALJ's consideration and weighing of Dr. Trubiano's opinion evidence in connection with formulating Plaintiff's RFC.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective [33]  medical filings alone . . . ."  20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

16

with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).  The requirement also ensures that the treating physician rule applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).  There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). The Undersigned finds no error with the ALJ's consideration and weighing of Dr. Trubiano's opinion with regard to both Plaintiff's mental and physical limitations..

The ALJ explained the weight assigned to Dr. Trubiano's opinion evidence as follows: "[L]ittle weight is given to the December 2012 functional assessment of Douglas Trubiano, D.O., as well as to his assessments of February 2012 and September 2011, as they are inconsistent with the . . . objective evidence that pertains to the period at issue." (R. at 24.) The ALJ also found that "Dr. Trubiano's medical records do not reveal significant objective findings to support a disabling condition and reveal no more than conservative pharmaceutical management." (R. at 20.)

The Undersigned concludes that the ALJ offered good reasons for discounting Dr. Trubiano's opinion and that the reasons are supported by substantial evidence. The ALJ reasonably discounted Dr. Trubiano's opinion as inconsistent with the other evidence in the record. *See* 20 C.F.R. § 404.1527(c)(3) (identifying "consistency" with the record as a whole as a relevant consideration). As the ALJ points out, Dr. Trubiano's opinion evidence contradicts both his treatment records from the relevant period and the objective evidence documented by Ms. Rush and Ms. Rittenhouse. (R. at 24.) The ALJ reasonably found as follows:

> [Dr. Trubiano] stated that the claimant's main debilitating impairment is severe anxiety causing panic attacks. However, as discussed above, he objectively assessed "mild" anxiety and affect in 2005 and 2006. (Exhibit 2F). Likewise, he assessed "mild" neck pain in 2005. (Exhibit 2F). Moreover, while his office notes of 2005 through 2007 indicate he assessed depression and anxious moods at times in addition to neck pain on flexion and extension, his office notes do not reveal significant objective findings to support his assessment of functional limitations. (Exhibit 2F).

18

(R. at 24.)  These findings are supported by substantial evidence.  Indeed, Dr. Trubiano's many characterizations of Plaintiff's anxiety and neck pain as "mild" directly contradict his 2011 and 2012 portrayal of these conditions as severe and debilitating.  Moreover, Plaintiff cites no clinical or other findings that support Dr. Trubiano's extreme functional limitations.

The ALJ also reasonably concluded that Dr. Trubiano's opinion of marked and extreme mental functional limitations contradicted the objective evidence of Plaintiff's activities of daily living documented by Ms. Rush and Ms. Rittenhouse.  (R. at 25-26.)  As set forth above, Plaintiff reported reading, performing household chores, and even driving on occasion. Moreover, neither of these specialists noted limitations or impairments consistent with Dr. Trubiano's later functional assessments.  Specifically, after examining Plaintiff, Ms. Rittenhouse made the following observations:

> Her speech was clear and of a goal directed nature.  She was well oriented in all spheres.  She was neither deluded nor hallucinated.  She appears to be of average intelligence.  She was cleanly and appropriately groomed.  In general her judgment is good.  Her insight is limited.  She denies suicidal intention or ideation.  Her mood was neutral and her affect was somewhat agitated.  She was wringing her hands.  Annette is fidgety.

(R. at 247.)  As noted above, after examining Plaintiff, Ms. Rush described Plaintiff as "very talkative and candid" with an "animated and bright" aspect.  (R. at 309.)  According to Ms. Rush, Plaintiff "cited no significant symptoms of depression" and appeared to have "good" insight and judgment.  (R. at 309-310.)  These inconsistencies, together with the record evidence as a whole, are good reasons for discounting Dr. Trubiano's opinions.  *See Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1001 (6th Cir. 2011) (setting forth inconsistency with other record evidence and activities of daily living as "good reasons" for discounting opinion evidence.)

Plaintiff's related contention that the ALJ erred in assigning less than controlling weight to Dr. Trubiano's opinion where "Dr. Turiano is the only medical source of record to even provide opinions," (ECF No. 8 at 11), lacks merit.  Plaintiff has not identified, and the Court is not aware of, any authority that would support such a proposition.  Rather, "'it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if . . . it is inconsistent with the other substantial evidence in the case record.'"  *Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188 at *2 (July 2, 1996)).  Moreover, as set forth above, the Commissioner reserves the power to decide certain issues such as a claimant's RFC. 20 C.F.R. § 404.1527(d).

Here, the ALJ placed a variety of physical and non-exertional limitations on Plaintiff's RFC in order to provide the accommodations for the limitations he found credible.  (R. at18.) "Discretion is vested in the ALJ to weigh all the evidence."  *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009).  The Undersigned concludes that the ALJ did not abuse this discretion in the manner in which he evaluated the opinion evidence of record and that his conclusions are supported by substantial evidence.

For the reasons explained above, therefore, the Undersigned finds no error with the ALJ's consideration and weighing of Dr. Trubiano's opinion.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  June 29, 2016                              ___*/s/ Elizabeth A. Preston Deavers*____
                                                     ELIZABETH A. PRESTON DEAVERS
                                                     UNITED STATES MAGISTRATE JUDGE